UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CRAIG BUTLER, | ) |
| Plaintiff, | ) |
| vs. | ) No. 10-cv-03814 |
| NATIONAL RAILROAD PASSENGER CORPORATION D/B/A AMTRAK, RUDY DURKOVIC, in his individual capacity, GREG AVEY in his individual capacity, and DOES 1 through 15¹ | ) Judge Joan H. Lefkow |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Craig Butler, filed a seven-count amended complaint against defendants, National Railroad Passenger Corporation d/b/a Amtrak ("Amtrak"), Rudy Durkovic, and Greg Avey (collectively referred to as "defendants"), alleging race discrimination in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775 ILL. COMP. STAT. 5/1-101 *et seq.* (counts I, II, III, and VI); and retaliation in violation of 42 U.S.C. § 1981, Title VII, and the IHRA (counts IV, V, and VII). Presently before the court is defendants' motion for summary judgment.² For the reasons that follow, defendants' motion is granted with respect to counts I, IV, V, VI, and VII and with respect to count II as to Avey and denied with respect to

---

¹ Butler also named as defendants Does 1 through 15; however, the fact that he has still not identified these defendants as this late stage warrants their dismissal. *See Strauss* v. *City of Chicago*, 760 F.2d 765, 770 n.6 (7th Cir. 1985).

² The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343, and 1349. Venue is appropriate in this district under 28 U.S.C. § 1391(b).

counts II and III as to Amtrak and Durkovic.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (a). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(e) & advisory committee notes (1963 amend.) While the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

## BACKGROUND[3]

Butler, who is African-American, worked at Amtrak beginning in October 2004 until his termination in July 2010. Butler started with Amtrak as a signal-helper in the engineering department. In 2006, Butler was promoted to the position of signalman and worked in various locations in the Chicago area including Union Station, the 14th Street Lumber Yard, the 16th Street Lumber Yard, and the 18th Street Lumber Yard. Beginning in February 2007 and until his termination, Butler held the position of locomotive electrician.

---

[3] The facts in the background section are taken from the parties' Local Rule 56.1 statement of facts and construed in the light most favorable to Butler. The parties largely dispute the events giving rise to the allegations in the case. At this stage, the court credits Butler's version of events because he is the nonmovant. *See Gawley* v. *Ind. Univ.*, 276 F.3d 301, 305 (7th Cir. 2001). Still, the court does not credit those statements that are inconsistent with the record or which are based upon evidence that does not support a denial.

Durkovic worked as a foreman at various Amtrak locations in Chicago, including the 14th Street Lumber Yard and the 16th Street Lumber Yard. From May 2008 until Butler's termination in June 2010, Durkovic supervised Butler several times a week.[4] Avey was the superintendent of locomotives at Amtrak's 16th Street location and a part of the management hierarchy over Durkovic.

Durkovic provided more opportunities to work overtime shifts to Caucasian employees. While Durkovic did not have responsibility for assigning overtime in advance, as a foreman, he had the power to ask an employee to work overtime if needed. Durkovic, without obtaining union approval, asked Caucasian employees who worked for him if they wanted to stay for extra four hour shifts. There were times when Butler arrived to work an overtime shift and he was told that the work was slow and was sent home. Durkovic also routinely under-reported the hours that Butler worked by failing to turn in Butler's work orders to the payroll department. Durkovic's under-reporting resulted in Butler's paycheck being less. Butler complained to the payroll department and they would fix the problem, although it sometimes took two pay periods for Butler to be fully reimbursed.

Butler and other African-American employees were only allowed twenty minutes for lunch and they could not leave the Yard.[5] Durkovic accused Butler one day of leaving the Yard

---

[4] The record is unclear as to whether Butler had other supervisors.

[5] Butler also notes that non-African-American employees received perks. Ed Dec, and other Caucasian employees, were given more time to take lunch breaks and could also leave the Yard. Dec had a golf cart that he drove through the work site while African-American employees had to carry their tools while walking to various job locations. Eddie Pavon, who is Puerto Rican, used a golf cart to drive through the Yard. Despite his contentions, Butler never asked Dec or Pavon to use their golf carts.

3

during lunch and Durkovic reported to Avey that he had not seen Butler for hours.[6] Butler did not leave the Yard that day and was working inside of a train. Butler had to gather written statements from co-workers confirming that he had not left the Yard that day in response to Durkovic's charge. Butler stopped taking lunch as a result of this incident.

In July 2008, Durkovic accused Butler of not being sufficiently productive during his shift. Shortly thereafter, Butler suffered a work related injury after Durkovic gave him an unsafe work assignment. Durkovic instructed Butler to work in a pit without proper lighting. Butler initially protested but complied with Durkovic's request and suffered a fractured nose. Butler missed a week of work as a result of his injury. After Butler returned to work, Durkovic accused him of not being productive and placed a disciplinary notice in Butler's personnel file. This was the first instance of discipline that Butler received during his tenure at Amtrak.

Beginning in August 2008, Durkovic called Butler dumb, lazy, stupid, told him that he should find another job, and said that Butler was not a real electrician. Butler was also aware that Durkovic referred to African-American workers[7] as "boy," "monkeys" and "bi–hes" and called African-American workers "lazy," "dumb," and "stupid." Butler also heard, but he does not indicate from whom, that Durkovic told another employee to "[g]o get the rest of the monkeys so that I can go give you guys your job assignment." (Defs. L.R. 56.1 ¶ 15.) In September 2008, Butler received a transfer for another position under a different foreman so that he would no longer have to work for Durkovic. Shortly thereafter, Durkovic switched positions with Butler's foreman and became his supervisor.

---

[6] Butler does not specify when this incident occurred.

[7] Durkovic made other disparaging comments about non-African-American employees and had verbal altercations with Caucasian employees.

On December 10, 2008, Durkovic assigned Butler and a Caucasian employee, Adam Rossal, to work on a locomotive engine. Amtrak's "blue flag policy" required setting up blue flag protection on the locomotive console to let others know that employees were working on the train. On December 11, 2008, Durkovic reported to Avey that he observed Butler working on the locomotive without blue flag protection. The next day, Durkovic and Avey initiated disciplinary charges against Butler for a blue flag violation. They did not institute disciplinary proceedings against Rossal even though he was also assigned to work on the locomotive with Butler. On December 14, 2008, Butler filed a discrimination complaint with Amtrak's Dispute Resolution Office ("DRO").[8] After realizing that the grievance process would take time, Butler signed a waiver for the December 10, 2008 blue flag violation and received a ten-day suspension.[9] The DRO continued to investigate Butler's discrimination complaint.

On February 6, 2009, Butler and Durkovic had a confrontation in the parking lot. Durkovic accused Butler of being insubordinate and threatening him. As a result of the confrontation, Butler was tested for drug and alcohol use. The results of Butler's alcohol test indicated that his blood alcohol level at the time was .084, which was approximately four times more than Amtrak's limit of .020. Butler signed a waiver in connection with his positive alcohol test and Amtrak held Butler out of service as a result. In addition, Amtrak's policy mandated that Butler be subject to follow-up testing for the next two years.

On July 29, 2009, the DRO sent Butler a letter detailing the results of its investigation

---

[8] Amtrak's DRO is tasked with investigating internal allegations of violations of its anti-discrimination and anti-harassment policy.

[9] Amtrak's policy permitted employees charged with a disciplinary offense to sign a waiver acknowledging guilt for the alleged offense.

into his complaint stemming from the December 10, 2008 blue flag violation.[10] The letter stated that "sufficient evidence exists to suggest that Mr. Durkovic discriminated against you because of your race when he reported you as working without blue flag protection on December 11, 2008," and that "evidence exists to suggest that you were treated less favorably [than Rossal], under the same set of circumstances, because of your race." (Dkt. 159 ¶ 58.) Amtrak overturned Butler's December 10, 2008 blue flag violation and removed the disciplinary charge from his record. Butler also received the back pay that he had lost during the time he was off work.

On August 26, 2009, Durkovic received a letter of counseling warning him about his treatment of employees and demeanor in the workplace. Amtrak's DRO initially recommended termination of Durkovic's employment; however, the DRO ultimately decided not to terminate Durkovic. In addition, the result of a separate DRO investigation into Durkovic revealed that Durkovic referred to African-American employees as "monkeys" and made other disparaging comments that violated Amtrak's Anti-Discrimination and Anti-Harassment Policy.

In September 2009, Butler contends that received another blue flag violation. Butler believed that the complaint was unfounded because he was not working on the train where the blue flag violation occurred. Amtrak held a hearing to determine the veracity of complaint for the blue flag violation. At the hearing, Greg Pierson testified that he approached Butler, who was working on the locomotive, and asked Butler where his blue flag protection was, to which Butler responded by pulling a blue flag from his pocket and placing it on the locomotive.

---

[10] Butler complained about Durkovic's conduct to Avey who told Butler that he would "look into it." This was the only conversation that Butler had with Avey about his problems with Durkovic.

Pierson testified that he saw Butler working on Train Nos. R25 and R83.[11] Butler received a 30-day suspension in connection with the September 2009 blue flag incident.[12]

Several months later, on the morning of Sunday June 13, 2010, Butler was asked to go to general foreman Sean Crownin's office. Butler did not report to Crownin's office until later that afternoon and he was given a Breathalyzer alcohol test, which returned a positive result of .024. Butler was retested shortly thereafter and the second test returned a positive result of .021. As a result of his second violation of Amtrak's drug and alcohol policy, Amtrak removed Butler from service. A formal investigation took place and the hearing officer sustained the charges that Butler twice violated Amtrak's drug and alcohol policies. Based on the hearing officer's determination, on July 12, 2010, Amtrak terminated Butler's employment.

## ANALYSIS

### I. Race Discrimination Claims under Title VII and 42 U.S.C. § 1981 (Counts II and III)

Butler alleges that defendants created a hostile work environment and discriminated against him based on race in violation of Title VII and 42 U.S.C. § 1981.[13] Defendants contend that Butler failed to exhaust his administrative remedies under Title VII; the evidence is insufficient to evidence a hostile work environment; and Butler waived his claim for race

---

[11] Butler contends that Pierson was mistaken about Butler's working on the locomotives in question. During the hearing, Butler noted that Pierson identified the person working without blue flag protection as "Greg Butler." Butler alleges that Durkovic identified Butler to Pierson as the employee working on the locomotives.

[12] In addition, on September 23, 2009, Butler was charged with violating Amtrak's attendance policy. Butler provided information showing that he was present the dates and times that he was purportedly absent. This violation ultimately was not sustained.

[13] Butler does not oppose defendants' motion for summary judgment with regard to count I, race discrimination under 42 U.S.C. § 1983, and defendants' motion is granted with respect to this claim.

7

discrimination based on disparate treatment.

### A. Whether Butler Exhausted His Administrative Remedies under Title VII for his Hostile Work Environment Claim

Defendants argue that Butler failed to exhaust his administrative remedies under Title VII[14] because his charge filed on October 7, 2009 with the United States Equal Employment Opportunity Commission omitted allegations in his complaint regarding the "severe and pervasive racial harassment" that Butler claims he experienced between September 2008 and June 2010. (Am. Compl. ¶ 12.) Butler's EEOC charge provided,

> I was hired by Respondent on October 9, 2004. My current job title is Electrician. During my employment, I have been disciplined. Non-Black employees under similar circumstances have not been disciplined. On December 14, 2008, I complained to management about alleged discrimination. Subsequently, I have been subjected to further discipline, unequal terms and conditions of employment, and have been denied of allocation of overtime hours.
>
> I believe that I have been discriminated against because of my race, Black, and retaliated against for engaging in a protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Defs. L.R. 56.1 ¶ 79.)

A party seeking redress under Title VII must first exhaust his administrative remedies by filing of a charge of discrimination with the EEOC and receiving a right to sue letter. *See* 42 U.S.C. § 2000e-5(f)(1); *Conner* v. *Ill. Dep't of Natural Res.*, 413 F.3d 675, 680 (7th Cir. 2005). While a plaintiff "cannot bring claims in a lawsuit that were not included in [his] EEOC charge," *Teal* v. *Potter*, 559 F.3d 687, 691 (7th Cir. 2009) (internal quotation marks omitted), the plaintiff's EEOC charge does not need to include "each and every fact that combines to form the

---

[14] Butler's § 1981 claim is available regardless of whether he exhausted his Title VII administrative remedies. *See Jenkins* v. *Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.3d 164, 166 (7th Cir. 1976) (en banc).

basis of each of claim in her complaint." *Cheek* v. *W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). A Title VII plaintiff can "litigate claims which are like or reasonably related to the allegations of the [administrative] charge and growing out of such allegations." *Teal*, 559 F.3d at 691–92 (internal quotation marks omitted). An allegation in an EEOC charge is reasonably related to a federal claim if it involves "the same conduct and implicate[s] the same individuals." *Ezell* v. *Potter*, 400 F.3d 1041, 1046 (7th Cir. 2005).

Here, Butler's EEOC charge alleged race discrimination and retaliation but it makes no mention of harassment.[15] Generally, claims for discrimination and retaliation in an EEOC charge are not reasonably related to claims for a hostile work environment. *See Moore* v. *Vital Prods., Inc.*, 641 F.3d 253, 257 (7th Cir. 2011); *Rush* v. *McDonald's Corp.*, 966 F.2d 1104, 1110–11 (7th Cir. 1992). Although Butler did not employ the term harassment specifically, his EEOC allegations used to substantiate his discrimination and retaliation claims also evidence a hostile work environment. The allegations in Butler's EEOC charge implicate Durkovic and provide certain instances of discrimination that Butler relies on his complaint to show a pattern of harassment. Indeed, Butler's charge provides that he was disciplined because of his race; subjected to unequal terms and conditions of employment; and denied overtime opportunities. In investigating Butler's allegations, it is likely that the EEOC would conclude that the instances of discrimination alleged in the EEOC charge could equate to a hostile work environment claim. *Cf. Kristufek* v. *Hussmann Foodservice Co.*, 985 F.2d 364, 368 (7th Cir. 1993) ("[T]he factual relationship of the age and discrimination charges of the parties is so related and intertwined

---

[15] Butler also notes that he provided the EEOC with an affidavit elucidating the conduct giving rise to his charge. Butler, however, did not attach that affidavit as an exhibit to his response. The court thus cannot consider this affidavit in resolving whether Butler exhausted his administrative remedies.

time, people, and substance that to ignore that relationship for a strict and technical application of the rule would subvert the liberal remedial purposes of the Act."); *see also Haugerud* v. *Amery Sch. Dist.*, 259 F.3d 678, 690 (7th Cir. 2001) (plaintiff's allegations in her federal complaint not included in her EEOC charge detailing her hostile work environment claim regarding "newly imposed maintenance assignments, negative comments, and an increased workload" grew out her the allegation in her charge that alleged "sex discrimination and harassment"); *Brindley* v. *Target Corp.*, 761 F. Supp. 2d 801, 807 (N.D. Ill. 2011) ("[I]it is noteworthy that there is no separate box on the EEOC form for hostile work environment claims (contrast the separate box provided for retaliation claims). It would surely be reasonable (and indeed logical) for a lay plaintiff to check the general discrimination box when seeking to advance a hostile work environment claim."). Accordingly, Butler exhausted his administrative remedies for purposes of Title VII and can maintain a hostile work environment claim.

### B. Whether Butler Has A Viable Hostile Workplace Claim Based on Race Discrimination

In his amended complaint, Butler alleges that Avey and Amtrak tolerated, encouraged, and approved of the hostile work environment toward African American employees that Durkovic created. To establish a hostile work environment claim, Butler must show that (1) the work environment was both subjectively and objectively offensive; (2) race was the cause of the harassment; (3) the conduct was severe or pervasive; and (4) a basis for employer liability exists. *See Yancick* v. *Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). The parties dispute whether Butler's allegations were severe or pervasive enough to satisfy the third prong of this test.

To be severe or pervasive, Butler must show that "the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive working environment that seriously affected his psychological well-being." *Herron* v. *DaimlerChrysler Corp.*, 388 F.3d 293, 302 (7th Cir. 2004); *see also Patton* v. *Keystone RV Co.*, 455 F.3d 812, 815–16 (7th Cir. 2006) (A defendant is liable for creating a hostile work environment "when the conduct at issue is sufficiently severe or pervasive to alter the conditions of the [victim's] employment and create an abusive working environment.") (internal quotation marks omitted). When examining whether a hostile work environment exists, it is important to consider the totality of the circumstances. *See Chaney* v. *Plainfield Healthcare Ctr.*, 612 F.3d 908, 912 (7th Cir. 2010) (noting that "the Supreme Court emphasized the importance of considering the entire context of the workplace") (citing *Oncale* v. *Sundowner Offshore Servs.*, *Inc*., 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998).

Butler relies on the following allegations to demonstrate a hostile work environment: (1) Durvkovic's disparaging comments about African-Americans and Butler specifically; (2) the July 2008 incident where Butler suffered an injury at work; (3) the December 2008 blue flag incident; (4) the denial of overtime opportunities and under-reporting of Butler's hours; and (5) Durkovic's reporting Butler for leaving the Yard during lunch for an extended period of time.[16]

---

[16] Butler also alleged that he was not allowed to use tool lockers and was not provided with HVAC training. Butler's response to defendants' Local Rule 56.1 statement of facts belie certain of these allegations. For example, Butler also alleges that defendants denied his requests for HVAC training; however, he never made such a request for such training. Butler's other complaints about not being able to use golf carts or a tool locker were not severe or pervasive to give rise to a hostile work environment. *See Herron*, 388 F.3d at 303 ("Here he complains about transfers, a late overtime payment, his salary, and difficulties with managers. This is normal workplace friction.").

(continued...)

First, Butler alleges that Durkovic made disparaging comments about African-American employees referring to them as "monkeys, boys, and bi–hes," told Butler that he was "lazy, dumb, and stupid," and should find another job. Butler, however, does not contend that Durkovic personally called him a "monkey"; rather, he relies on what he heard others tell him. These racially charged comments are relevant to Butler's claim, however, they carry less impact as "second-hand harassment" than the comments made directly to Butler. *See Patt* v. *Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) ("Although [] comments [conveyed to the plaintiff by others] are relevant to [the plaintiff's] claim, the impact of such second-hand harassment is obviously not as great as harassment directed toward [the plaintiff] herself.") (internal quotation marks omitted); *Ngeunjuntr* v. *Metro. Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998) (isolated comments that in some instances were made outside the presence of the plaintiff did not support a hostile work environment claim). Durvkovic's comments to Butler directly indicating that he was "lazy, dumb, and stupid" were offensive but not inherently racial. *See, e.g., Hardin*, 167 F.3d at 345–46 (comments that did not implicate negative attitudes toward African-Americans were not discriminatory); *Brown* v. *Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012) ("Title VII protects against discrimination, not personal animosity or juvenile behavior.") (internal quotation marks omitted). Durkovic's comments alone do not establish a hostile work environment; however, Butler has additional evidence to substantiate his claim.

Second, in addition to Durkovic's comments, Butler notes that in July 2008, Durkovic

---

[16](...continued)

instructed Butler to work in a pit without proper lighting and Butler suffered a fractured nose as a result. That Butler suffered physical harm in connection with performing a dangerous job assignment that he argues was tasked to him because of his race lends additional support for Butler's hostile work environment claim. *See Porter* v. *City of Chicago*, 700 F.3d 944, 955–56 (7th Cir. 2012) (totality of the circumstances in determining whether a hostile work environment exists includes looking to "the severity of the allegedly discriminatory conduct, its frequency, whether it is *physically threatening* or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance.") (emphasis added) (internal quotation marks omitted).

Last, Butler relies on the DRO's investigation into the December 2008 blue flag incident.[17] The DRO's conclusion that Durkovic targeted Butler for discipline because of his race raises a question regarding the degree to which Durkovic's antagonism toward Butler was severe or pervasive enough to create a hostile work environment. The DRO's conclusion further buttresses Butler's other allegations showing that Durkovic's treatment created a workplace environment that unreasonably interfered with his ability to perform his job. Namely, Butler contends that Durkovic affected his pay by denying him the opportunity to work overtime and under-reported his hours. Butler also notes that Durkovic falsely accused him of leaving the

---

[17] Defendants allege that Butler's allegations were isolated instances that did not give rise to a hostile work environment. *See Ellis* v. *CCA of Tenn. LLC*, 650 F.3d 640, 648 (7th Cir. 2011) ("[I]solated incidents, unless extremely serious, will not support a hostile work environment claim.") (internal quotation marks omitted). Butler has presented sufficient evidence linking these instances together to evidence a hostile work environment. Butler alleged that the instances of discrimination began in 2008 when Durkovic started as his supervisor and continued until Butler's termination in 2010. Durvkovic was thus the common thread tying Butler's individual allegations of discrimination to evidence a continuing pattern of harassment. *See Lucas* v. *Chicago Transit Auth.*, 367 F.3d 714, 724 (7th Cir. 2004) ("[Hostile] work environment claims involve [] repeated conduct that may not be actionable on its own. Rather, such claims are based on the cumulative effect of individual acts.") (internal quotation marks omitted).

Yard during lunch, and as a result, Butler stopped taking lunch breaks. The DRO's conclusion provides the context for these other instances of discrimination, and their combined effect on Butler's ability to perform his job preclude summary judgment on his hostile work environment claim. *Cf. Isaacs* v. *Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 387 (7th Cir. 2007) ("A jury could infer that working conditions for female laborers at [the defendant] were materially worse than the conditions for male laborers, that managers of the firm knew this, and that they did nothing because the firm deemed the men's morale more important than the women's welfare.").[18] Accordingly, defendants' motion for summary judgment as to count II is denied as to Durkovic and Amtrak, and as to count III is denied as to Amtrak.[19]

### C. Whether Butler Can Maintain a Claim of Race Discrimination Based On Disparate Treatment

Butler also claims that defendants are liable for discrete acts of discrimination based on the December 2008 blue flag incident leading to his suspension and the denial of overtime payments.[20] Defendants argue at the outset that Butler never pleaded a discrimination claim based on disparate treatment.

Still, it is well settled under Seventh Circuit precedent that a plaintiff need not "plead

---

[18] Under § 1981, as opposed to Title VII, individuals may be liable. *See Smith* v. *Bray*, 681 F.3d 888, 896 n.2 (7th Cir. 2012). Butler's allegations against Avey for race discrimination are thin. Butler admits that he only spoke to Avey once about his problems with Durkovic. Butler also contends that Avey did not conduct sufficient investigations during the instances where Durkovic disciplined Butler. These allegations, however, do not substantiate the elements of a hostile work environment claim. Avey is thus entitled to summary judgment on Butler's § 1981 race discrimination claim in count II.

[19] Neither party addresses the last element of this test, *i.e.*, whether Amtrak may be liable for Durkovic's conduct giving rise to a hostile work environment claim.

[20] Butler also alleged that the September 2009 blue flag incident was evidence of race discrimination based on disparate treatment. Butler, however, did not include the September 2009 blue flag incident in his EEOC charge and thus cannot use that incident as a basis to support his Title VII race discrimination claim. *See Teal*, 559 F.3d at 691.

14

with precision legal theories or detailed facts.'" *Jajeh* v. *Cnty. of Cook*, 678 F.3d 560, 567 (internal quotation marks omitted); *see also Hatmaker* v. *Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010) ("[P]laintiffs in federal courts are not required to plead legal theories."). Butler's amended complaint alleges that "Defendant DURKOVIC has routinely discriminated against African-American and other minority employees" and "Defendants acted in conformance with [] AMTRAK's official policy, custom and practices of tolerating, encouraging and approving racial discrimination . . ." (First Am. Compl. ¶ 9; ¶ 34; *see also* ¶ 38.) In order to state a claim for race discrimination, a plaintiff need only allege that he was discriminated against because of his race. *See Huon* v. *Johnson & Bell, Ltd.*, No. 09 CV 7877, 2012 WL 1932120, at *6 (N.D. Ill. May 23, 2012); *Day* v. *River Forest Sch. Dist.*, No. 10 CV 4426, 2011 WL 1004611, at *4 (N.D. Ill. Mar. 17, 2011). Here, Butler alleged that he suffered discrimination on account of his race and thus adequately pleaded a claim for race discrimination based on disparate treatment. Butler thus can maintain a claim for race discrimination based on disparate treatment in connection with the December 2008 blue flag incident and the denial of overtime.[21]

## II. Retaliation Claims Under Title VII and 42 U.S.C. § 1981 (Counts IV and V)

Butler claims that defendants are liable for retaliation under Title VII and § 1981 for suspending Butler after he filed an internal complaint alleging race discrimination in connection

---

[21] Defendants also argue that Butler's counsel characterized his case to the court and in briefing as one based on a "hostile work environment" and "racial harassment." Defendants rely on *Walker* v. *Mueller Indus., Inc.*, No. 02 C 6615, 2003 WL 22410081, at *3 (N.D. Ill. Oct. 21, 2003), *aff'd* 408 F.3d 328, 330–31 (7th Cir. 2005) to argue that Butler's representations to the court constituted a waiver of his disparate treatment claim. Judge Coar's opinion in *Walker*, however, is distinguishable in that the plaintiff's deposition testimony clearly provided that he was not pursuing a claim for race discrimination. Here, the representations by Butler's counsel do not unequivocally provide that he was not pursuing a disparate treatment claim such as to constitute a waiver. *See Piggie* v. *Cotton*, 342 F.3d 660, 665 (7th Cir. 2003) ("[W]aiver is the intentional relinquishment of a known right.").

15

with the December 2008 blue flag incident.[22] Butler can proceed under either the direct method or indirect burden-shifting method of proof detailed in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) to substantiate his retaliation claims. Under the direct method, Butler must show that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *See Kodl* v. *Bd. of Educ. Sch. Dist. 45*, 490 F.3d 558, 562 (7th Cir. 2007). Under the indirect burden-shifting method, Butler must show that he (1) engaged in statutorily protected activity; (2) was meeting Amtrak's legitimate employment expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees. *See Amrhein* v. *Health Care Serv. Corp.*, 546 F.3d 854, 859 (7th Cir. 2008). If Butler makes his *prima facie* case, the burden shifts to defendants to show that a non-retaliatory reason for its actions exist. *Id*. The burden then shifts back to Butler to show that the proffered reason is pretextual. *Id*. at 860. Butler relies on the following two events as evidence of defendants' retaliatory conduct stemming from his December 2008 complaint: (1) the February 6, 2009 altercation with Durkovic that resulted in a suspension; and (2) the September 2009 blue flag violation that resulted in a suspension.[23]

Defendants argue that Butler's allegations fail under the direct method because no causal connection exists between the aforementioned incidents and Butler's complaint to the DRO in

---

[22] The elements of proof for retaliation claims under Title VII and § 1981 are "essentially identical" and are analyzed together. *Brown* v. *Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1104 n.1 (7th Cir. 2012).

[23] In his complaint, Butler also alleged that his September 25, 2009 attendance policy violation and Amtrak's failure to retest his blood alcohol level in June 2010 evidenced unlawful retaliation. Butler, however, did not raise these issues in his response to defendants' motion for summary judgment and accordingly the court will not consider them in connection with Butler's retaliation claims.

December 2008. Indeed, Butler provides no evidence that his December 2008 complaint to the DRO was a "substantial or motivating factor" in his subsequent suspensions.[24] *See Gates* v. *Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008) (internal quotation marks omitted). The duration of time between the complaint and the incidents further belie the existence of a causal connection. *See*, *e.g.*, *Leitgen* v. *Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011) ("When an employee's protected conduct is separated by a significant period of time from the adverse employment action, the proximity of the incidents does not support a causal connection between them."); *Temanovich* v. *City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006) (noting that the Seventh Circuit "has held a temporal connection of four months failed to establish a causal connection between a protected activity and an adverse action."). Butler thus fails to show retaliation under the direct method.

Defendants also argue that Butler cannot use the indirect burden-shifting method to avoid summary judgment on his retaliation claims because legitimate non-retaliatory reasons existed for suspending Butler. First, with regard to the February 2009 altercation with Durkovic, Butler admitted that his blood alcohol level at the time of the dispute was .084, which was more than four times Amtrak's limit. Based on Butler's blood alcohol level, defendants had a legitimate non-retaliatory reason for suspending Butler after his confrontation with Durkovic. Second, with

---

[24] Butler notes in his response that the September 2009 blue flag incident immediately followed Amtrak's decision in August 2009 to overturn his suspension and award back pay after the DRO investigated the December 2008 blue flag incident. Butler insinuates that the close timing between the August 2009 overturning of his prior suspension and the subsequent discipline for the second blue flag incident in September 2009 evidenced retaliation. Butler's only evidence of causation is that the two incidents occurred approximately one month apart. Without more, Butler cannot make the necessary link to establish a causal connection under the direct method. *See*, *e.g.*, *Leitgen* v. *Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011) ("[S]uspicious timing alone is almost always insufficient to survive summary judgment.").

respect to the September 2009 blue flag incident, independent evidence considered by a neutral decision-maker concluded that Butler violated the blue flag policy by failing to set up the requisite flags. Defendants thus had a legitimately non-retaliatory reasons for disciplining Butler in connection with the September 2009 blue flag violation. Butler thus cannot rely on the indirect method to substantiate his retaliation claims. Accordingly, defendants are granted summary judgment with respect to counts IV and V.

## III. Race Discrimination and Retaliation Under the Illinois Human Rights Act (Counts VI and VII)

Butler also claims that defendants are liable for race discrimination and retaliation under the Illinois Human Rights Act ("IHRA"). Butler failed to respond to defendants' argument that he failed to exhaust his administrative remedies with respect to his IHRA claims. At the summary judgment stage, the nonmoving party must present facts showing a genuine issue for trial. *See Payne* v. *Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). Because Butler failed to develop any argument in response to defendants' motion for summary judgment regarding his IHRA claims, he is deemed to have abandoned those claims. *See Palmer* v. *Marion Cnty.*, 327 F.3d 588, 597–98 (7th Cir. 2003); *De* v. *City of Chicago*, - - - F. Supp. 2d - - - -, 2012 WL 6605009, at \*\*22–23 (N.D. Ill. Dec. 14, 2012). Accordingly, defendants' motion for summary judgment is granted with respect to counts VI and VII.

## CONCLUSION

Defendants' motion is granted with respect to counts I, IV, V, VI, and VII and denied with respect to counts II and III. Summary judgment is granted for Avey with regard to count II. This case will be called for a status hearing on April 18, 2013 at 8:30 a.m. The parties are directed to engage in a sincere effort to settle this case and to report the potential for

settlement at the next status hearing and whether referral to the magistrate judge for a settlement conference would be helpful.

Dated: March 26, 2013                                Enter: _____
                                                                              JOAN HUMPHREY LEFKOW
                                                                                United States District Judge

.